Filed 9/18/13  P. v. Bocanegra CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055487 |
| v. | (Super.Ct.No. FVA1101476) |
| DIEGO BOCANEGRA et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant Diego Bocanegra.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Salvador Hernandez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, Andrew Mestman and Kathryn A. Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendants and appellants Diego Bocanegra and Salvador Hernandez (collectively, "defendants") of two counts of second degree robbery of victims Oscar Bracamontes and Carlos Vaquera (collectively, "victims") (Pen. Code, § 211— counts 1 & 2).[1] The jury additionally found true allegations defendants had personally used a firearm in their commission of the robberies (§ 12022.53, subd. (b)); had committed the robberies for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)); and that a principal had personally used a firearm in the commission of the robberies (§ 12022.53, subs. (b) & (e)(1)). The court sentenced defendants to an aggregate, determinate term of imprisonment of 19 years, 4 months, consisting of the following: the five-year aggravated term for the robbery in count 1; 10 years for the personal use enhancement on count 1; punishment stricken, on the gang enhancement on count 1; one third the midterm of three years (one year) consecutive on count 2; one third the midterm of 10 years (three years, four months) consecutive for the personal use enhancement on count 2; and punishment stricken for the gang enhancement on count 2.

On appeal, Hernandez contends the court abused its discretion in declining his request for a Spanish interpreter, erred pursuant to *Miranda*[2] in permitting admission at trial of his incriminating statement to police, abused its discretion in imposing the upper term on the count 1 offense, and that his sentence violates federal and state constitutional

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

prohibitions against cruel and unusual punishment. Bocanegra maintains the court committed *Crawford*[3] error in allowing admission of Hernandez's inculpatory statement during trial and that insufficient evidence supports the jury's true findings on the gang enhancements. Defendants join each others' arguments to the extent they may benefit from them. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

On September 16, 2011, sometime between 8:00 and 9:00 p.m., the victims started deejaying a party in the backyard of a residence in Rialto. They had laptops, turntables, speakers, colored stage lights, a mixer, and headphones. Bracamontes was using his $17,000 MacBook Pro laptop, on a four-foot table, behind which the victims stood while deejaying. Vaquera's Sony Vaio laptop was also on the table. Around 100 people were in the backyard dancing at the party.

Vaquera testified that after about an hour, Bocanegra came up the table, grabbed Bracamontes's laptop, and dropped it to the ground. Bracamontes reached down to get it. Bocanegra then pulled out a gun, pointed it at the victims, and demanded the laptop. Bracamontes handed Bocanegra the laptop; Bocanegra yelled, "This is South Side Pomona, Mother Fucker." Bocanegra handed off the gun to Hernandez, who was wearing a hat with the letter "P" on it. Hernandez pointed the gun at people at the party; someone took Vaquera's laptop; defendants then left together.

---

[3] *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).

3

Bracamontes testified Hernandez was the individual who initially knocked his laptop off the table then picked it up, pointed the gun at his face, and demanded the laptop or he would shoot. Hernandez was wearing a hat with the letter "P" on it. Hernandez handed off the gun to Bocanegra who pointed it at the victims. Bracamontes handed over his laptop. Defendants grabbed Vaquera's computer and left.

The victims packed up their remaining equipment and went looking for defendants. Their friend "Chuy" called the police and also went looking for defendants. Chuy called the victims when police stopped the vehicle in which defendants had left the party. The victims arrived at the location where the police had stopped defendants less than an hour after the robbery.

Out of a group of six individuals detained from the vehicle, the victims identified Bocanegra and Hernandez as the individuals who robbed them. A .357 revolver and two laptops—a Mac Book Pro and a Sony Vaio—were found in the vehicle. Vaquera and Bracamontes were able to recover their laptops by proving their ownership of them by logging onto the computers with their passwords. Bracamontes identified the revolver as the one pointed at the victims.

Rialto police officer Ralph Ballew testified that when detained, Hernandez was wearing a hat with the letter "P" on it. Hernandez also had a tattoo on his left arm reading "SSP." While at the Rialto jail booking defendants, the jailer asked Ballew why so many of the people being booked were from Pomona. Hernandez, who was seated on a bench with three other individuals including Bocanegra, stated "'Came to lame ass Rialto to put in work and represent South Side.'"

4

Pomona police officer Jaime Martinez testified as the People's expert gang witness. Martinez, who was born and raised in the south side of Pomona, had been a police officer in Pomona for six years. He had been assigned to the Gang Violence Suppression Unit for the preceding four years. Martinez testified he was very familiar with the South Side Pomona (SSP) gang. In his experience, he had contact with well over 1,500 gang members in Pomona. He had investigated and assisted in investigations of numerous crimes committed by members of SSP, including several in which firearms were used. He had attended public schools, and he had worked with SSP members prior to becoming a police officer. At one point, he had even befriended a SSP member.

SSP was originally a tagging crew in the 1970s that was part of a clique within the 12th Street gang. A SSP member named Victor Hernandez, with whom Martinez was very familiar, requested permission from the Mexican Mafia for SSP to become its own gang separate from 12th Street. The Mexican Mafia granted permission, but required SSP to earn its "trece" or gang designator by putting in "work," i.e., robberies, assaults, thefts, and felony vandalisms. SSP has been a recognized gang by the Pomona Police Department since the early 1980s.

Martinez testified there were currently approximately 35 active members and 35-40 associates in SSP. Members of SSP usually wear clothing with the letter "P." Members also wear clothing or have tattoos with the letters "S" and "SSP." Because members of SSP were still trying to earn its "trece," they would commit whatever crimes they could wherever they could, especially outside of its territory, so SSP could make a

5

name for itself. Members "bang" or let the victims of their crimes know what gang they are from in order to obtain recognition.

The hat worn by Hernandez is the type typically worn by SSP members. Likewise, Hernandez's tattoo reading "SSP" is typical of SSP gang members. Anyone who had such a tattoo who was not a member of the gang would find himself in trouble with the gang. Martinez opined Hernandez was an active member of SSP.

Martinez had had one prior contact with Bocanegra during which Bocanegra admitted he was a member of SSP. Martinez had also reviewed field interrogation cards on Bocanegra and spoken to other officers who had had contact with him. Martinez opined Bocanegra was an active member of SSP.

Martinez testified SSP's primary activities were "[f]elony vandalisms, burglaries, robberies, assaults, assaults with deadly weapons, grand theft autos, thefts, witness intimidation, [and] extortions." Documented SSP member Max Nunez was convicted on May 24, 2011, for making criminal threats and a true finding was rendered that the offense was gang related. Martinez had had numerous contacts with Nunez and had arrested him on one occasion. John Rodriguez, another documented SSP member, was convicted of carrying a concealed firearm and possession of a controlled substance for sale on May 4, 2011. Martinez had had contact with Rodriguez on several occasions and once assisted in his arrest.

Bocanegra testified that although he was at the party with 10 other people, most of whom were SSP members, he did not commit the robbery or point a gun at anyone. He testified he was not a member of SSP, but knows members of SSP from school and his

6

community where he spends time with them.  Hernandez was a member of SSP at one point in time, but was no longer.  Hernandez did not commit the robbery either.

Bocanegra testified he witnessed the robbery; it was committed by a man named Irving Sisneros who looked like Bocanegra and with whom Bocanegra came to the party.  Sisneros yelled "South Side Pomona, Mother Fucker" when he committed the robbery.  Bocanegra left the party with Sisneros, who fled from the scene when the vehicle was stopped by police.  There were six people in the car when it was stopped; some of them were SSP members.  The stolen laptops were in the vehicle.

## DISCUSSION

A.      SPANISH INTERPRETER

Hernandez contends the trial court abused its discretion when it denied his request for a Spanish interpreter.  We disagree.

"The right to an interpreter has its underpinnings in a number of state and federal constitutional rights.  These include a defendant's rights to due process, to confrontation, to effective assistance of counsel, and to be present at trial.  [Citation.]  The California Constitution provides that a criminal defendant who does not understand English 'has a right to an interpreter throughout the proceedings.'  [Citation.]" (*People v. Romero* (2008) 44 Cal.4th 386, 410.)

"[W]hen the ability of one charged with a crime to understand English is being evaluated at the outset of the proceedings, the burden is on the accused to show that his understanding of English is not sufficient to allow him to understand the nature of the

proceedings and to intelligently participate in his defense." (*In re Remundo* (1988) 203 Cal.App.3d 1447, 1454.)

"'The question of the necessity of an interpreter . . . is a matter for judicial determination over which the trial court is permitted to exercise its discretion.' [Citations.]" (*In re Remundo*, *supra*, 203 Cal.App.3d at pp. 1455-1456.) "'"[W]here a trial court has discretionary power to decide an issue, a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination . . . .'"" [Citation.]" (*Id*. at p. 1456.) "This exercise of discretion should not be reversed unless there is a complete lack of any evidence in the record that the accused does understand English, thereby rendering the decision totally arbitrary." (*Ibid*.)

Hernandez indicated he would like a Spanish interpreter largely because he did not understand the legal terminology or procedures communicated to him by defense counsel. Although Hernandez stated, "I really don't understand in English," the court thoroughly examined Hernandez's educational background in English. Defendant stated he started his education in Kindergarten in the United States with instruction in both English and Spanish. His first grade instruction was in English only. He was taught how to read and write in English. He took tests in English. He passed from first through eleventh grades with instruction in English. He was never taught to read in Spanish. He never took tests in Spanish.

Defense counsel informed the court, "I have solely and exclusively spoken to . . . Hernandez in the English language. He proceeded to preliminary hearing . . . in the

8

English language entirely." Neither defendant used an interpreter at the preliminary hearing. Defense counsel further observed, "in the approximately three months that I've been dealing with this case, . . . Hernandez has neither indicated any sort of a failure to understand when I am speaking to him in English, nor has he ever previously requested any sort of an interpreter."

The court found, "you don't need an interpreter. My belief is you don't even know how to read Spanish. And even if these legal words were written in Spanish, you wouldn't know what they were." The court further noted that most people who are native English speakers do not understand legal jargon. Thus, the court denied defendant's request.

Hernandez failed his burden of proving he did not have a sufficient understanding of English. As the court's questioning revealed, Hernandez had been educated primarily, if not solely, in English for most of his life. He was not educated in Spanish. Hernandez had never previously indicated any problem understanding English to his attorney or the court. Thus, the court acted within its discretion in denying Hernandez's request.

B.    *MIRANDA*

Hernandez contends the court erred in refusing to exclude from trial his statement to officers that he, "'Came to lame ass Rialto to put in work and represent South Side.'" We disagree.

Prior to trial, Hernandez sought to exclude evidence of his statement. Ballew testified Hernandez and Bocanegra were sitting on the bench outside the interview room. As Ballew exited the interview room processing paperwork, one of the jailers said to him,

9

"'What are these guys doing in Rialto?  They're all from Pomona.'"  Hernandez overheard the question and spontaneously said, "'Came to lame ass Rialto to put in work and represent South Side.'"  Ballew was not interviewing Hernandez at the time.  Six individuals were on the bench when Hernandez made the statement.[4]  The court denied Hernandez's request to exclude the statement.

"Defendants who are in custody must be given *Miranda* warnings before police officers may interrogate them.  [Citation.] . . .  '[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.'  [Citation.]  [¶]  '"Clearly, not all conversation between an officer and a suspect constitutes interrogation.  The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response."'  [Citations.]"  (*People v. Huggins* (2006) 38 Cal.4th 175, 198.)

---

**4**  At trial, Ballew corrected himself, noting that of the six individuals detained, two were adults and so were "kept apart."  Thus, only four people were sitting on the bench when Hernandez made the statement.

10

"'Interrogation thus refers to questioning initiated by the police or its functional equivalent, not voluntary conversation. [Citation.] "'Volunteered statements of any kind are not barred by the Fifth Amendment . . . .'"' [Citations.] Consequently, the police 'may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 387-388.)

"Although we review the record and independently decide whether the challenged statements were obtained in violation of *Miranda*, . . . we may "'give great weight to the considered conclusions"' of the trial court. [Citations.]" (*People v. Nelson* (2012) 53 Cal.4th 367, 380.) "When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

Here, although defendant was in custody when he made the statement, it was not in response to any question posed him. Ballew testified both before and during trial he was not interviewing Hernandez when Hernandez made the statement. Likewise, the jailer had directed his question to Ballew, not Hernandez, when the latter made the incriminating remark. Rather, Hernandez volunteered the statement. Moreover, there were at least four individuals on the bench at the time the jailer queried Ballew regarding

11

the suspects' home city. Thus, Hernandez could not reasonably believe the question was either expressly or implicitly directed at him. Furthermore, even if directed at Hernandez, the question was not one that would normally be used to solicit incriminating statements. Therefore, the statement was neither made in response to interrogation nor was the jailer's question one that would normally call for an incriminating response. The court acted appropriately in permitting the statement's admission into evidence.

## C. *CRAWFORD*

Bocanegra contends the court erred pursuant to *Crawford*, *supra*, 541 U.S. 36 in admitting Hernandez's statement because he was never given the opportunity to cross-examine Hernandez regarding the statement. Bocanegra maintains the statement was testimonial and, therefore, per se excludable pursuant to *Crawford*. In the event we do not find Hernandez's statement testimonial, Bocanegra argues the decisions in *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) (superseded by statute on another ground as recognized in *People v. Fletcher* (1996) 13 Cal.4th 451, 465) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) compel its exclusion regardless. In any event, defendant contends the admission of the statement deprived him of due process. We disagree.

### 1. *TESTIMONIAL*

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' [T]his bedrock procedural guarantee applies to both federal and state prosecutions. [Citation.]." (*Crawford*, *supra*, 541 U.S. at p. 42.) "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required:

12

unavailability and a prior opportunity for cross-examination. . . . Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id*. at p. 68, fn. omitted.) "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." (*Id*. at pp. 68-69.)

"The text of the Confrontation Clause reflects this focus. It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford*, *supra*, 541 U.S. at p. 51.) "Various formulations of this core class of 'testimonial' statements exist: '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' [citation.]" (*Id*. at pp. 51-52.) "Statements taken by police officers in the

course of interrogations are also testimonial under even a narrow standard." (*Id*. at p. 52.)

In *Davis v. Washington* (2006) 547 U.S. 813, the court found it necessary to provide a more comprehensive definition of "testimonial": "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id*. at p. 822, fn. omitted.) "A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Id*. at pp. 827.) Nonetheless, where an officer interviews a victim after any threat of danger had dissolved, statements made by the victim to the officer are "testimonial" because they are made primarily, if not, solely, for the purpose of investigating a crime. (*Id*. at pp. 827, 829-830, 832.)

Here, Hernandez's statement was not testimonial. Hernandez was not being interviewed. Rather, Hernandez's statement was a spontaneous, volunteered exclamation in response to the jailer's query of Ballew while Hernandez was seated on a bench with others outside the interview room. As such, there was no degree of formality or solemnity in the circumstances giving rise to the statement. Hernandez's statement was not solicited; the jailer's question could not be viewed as the type made in order to assist

14

in an investigation as it had nothing to do with the crimes. Since the statement was not testimonial, Bocanegra's right to confrontation was not violated by the court's admission of the statement. The court acted appropriately in admitting the statement.

### 2.     *NONTESTIMONIAL EXCLUSION*

Bocanegra contends that under *Bruton*, even nontestimonial statements by a codefendant may be excluded as violative of the Sixth Amendment's confrontation clause. We disagree.

In *Bruton*, *supra*, 391 U.S. 123, the court held: "[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured by the Sixth Amendment, [citation]; 'a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him.' [Citation.]" (*Id*. at p. 126.) A jury convicted Bruton after the court admitted the confession of his codefendant, Evans, which inculpated Bruton by name. The confession was made to a postal inspector during an in-jail interrogation conducted after city police officers had already obtained a confession from Evans. On appeal, Evans's confession was held inadmissible as violative of *Miranda*. On retrial, Evans was acquitted. (*Bruton*, at pp. 125-126.)

Although *Crawford* mentioned *Bruton* (*Crawford*, *supra*, 541 U.S. at p. 57), it never expressly overruled or acknowledged that its decision in any way replaced *Bruton*. Nevertheless, dictum in *Crawford* strongly suggested the Confrontation Clause no longer applied to nontestimonial statements. (*Crawford*, at pp. 60-61 [analysis casts doubt on previous holding that confrontation clause applied to nontestimonial statements].)

15

Indeed, a long line of subsequent state and federal cases, including decisions by the United States Supreme Court itself, have expressly ruled *Crawford* eliminated confrontation clause protection for nontestimonial statements.  (*People v. Arceo* (2011) 195 Cal.App.4th 556, 575 ["[T]he confrontation clause applies only to testimonial statements"]; *People v. Gutierrez* (2009) 45 Cal.4th 789, 812 ["Only the admission of testimonial hearsay statements violates the confrontation clause"]; *United States v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85 ["The threshold question in every case is whether the challenged statement is testimonial.  If it is not, the Confrontation Clause 'has no application'"]; *United States v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326 ["Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements"]; *Davis v. Washington*, *supra*, 547 U.S. at p. 821 [only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause"]; *Whorton v. Bockting* (2007) 549 U.S. 406, 420 [*Crawford* eliminated "Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements"]; *Michigan v. Bryant* (2011) 131 S.Ct. 1143, 1153 ["We therefore limited the Confrontation Clause's reach to testimonial statements"].)

Moreover, even to the extent *Bruton* could be construed as providing confrontation clause protection to certain nontestimonial statements, we would find it inapplicable here.  First, unlike *Bruton*, the statement here was not made under interrogation.  Second, the statement by Hernandez was not found violative of *Miranda*.  Third, Hernandez's statement did not expressly inculpate Bocanegra.  Hernandez did not mention

16

Bocanegra's name nor did he say, "*We* 'came to lame ass Rialto to put in work and represent South Side.'" (Italics added.) Rather, the statement would appear to inculpate only Hernandez himself. Furthermore, Hernandez was seated on the bench with three other individuals, only one of whom was Bocanegra. Thus, even to the extent his remark could be construed as including someone other than himself, there was no way it expressly implicated Bocanegra. Finally, the court instructed the jury both before the admission of the statement and after trial with CALCRIM No. 305 informing it that it could not use the statement against Bocanegra.[5] Thus, Hernandez's statement was not the sort of nontestimonial evidence, which powerfully implicated Bocanegra such that it should have been excluded as violative of the confrontation clause.

3.     *DUE PROCESS*

Bocanegra further maintains that admission of Hernandez's statement violated his right to due process pursuant to *Aranda* and *Bruton*. We disagree.

As stated *ante*, "[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured by the Sixth Amendment, [citation]; 'a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses

---

[5] "'[O]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness "against" a defendant if the jury is instructed to consider that testimony only against a codefendant.' [Citation.] The only exception to this rule is the narrow class of statements falling within the holdings of *Bruton* . . . that is, statements that powerfully incriminate the defendant on their face because they directly implicate the defendant by name or do so in a manner the jury could not reasonably be expected to ignore. [Citations.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 506.)

17

against him.' [Citation.]" (*Bruton*, *supra*, 391 U.S. at p. 126.) "'Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.'" (*Id*. at p. 131, fn. 5.) "In the absence, however, of a holding by the United States Supreme Court that the due process clause requires such change, the rules we now adopt are to be regarded, not as constitutionally compelled, but as judicially declared rules of practice to implement section 1098." (*Aranda*, *supra*, 63 Cal.2d at p. 530, fn. omitted.)

In *Aranda*, the defendant's codefendant confessed, during a series of police interrogations, that he and Aranda had committed a robbery. (*Aranda*, *supra*, 63 Cal.2d at p. 522.) The codefendant testified at trial and denied making the confession; admission of the confession was later determined to be constitutionally infirm and the codefendant's conviction was reversed. (*Id*. at p. 523.) The court held that, "When, however, the confession implicating both defendants is not admissible at all, there is no longer room for compromise. The risk of prejudicing the non-confessing defendant can no longer be justified by the need for introducing the confession against the one who made it." (*Id*. at p. 525.)

First, any due process argument regarding the inadmissibility of Hernandez's statement as prejudicial to Bocanegra is largely, if not entirely, subsumed within the Sixth Amendment confrontation clause analysis. *Bruton* recognized that admission of a non-admissible codefendant's statement against another was a due process violation largely because the defendant was not permitted the right to confront the witness regarding the statement. (*Bruton*, *supra*, 391 U.S. 123 at p. 131, fn. 5.) On the other

18

hand, *Aranda* noted that the United States Supreme Court had, as of that time, not rendered a decision as to whether admission of a codefendant's prior statement inculpating another defendant without the right of confrontation was a violation of due process; thus, the court ruled the practice violated judicially implemented rules regarding state statutory law. (*Aranda*, *supra*, 63 Cal.2d at p. 530.) Second, both *Aranda* and *Bruton* are factually distinguishable. Unlike in those cases, Hernandez's statement has never been found inadmissible. Moreover, unlike *Burton* and *Aranda*, Hernandez's statement was not the result of custodial interrogation. Furthermore, Hernandez's statement did not directly implicate Bocanegra. Thus, the admission of Hernandez's statement was not "'so unduly prejudicial that it render[ed] the trial fundamentally unfair.' [Citation.]" (*People v. Bivert* (2011) 52 Cal.4th 96, 118.) Therefore, there was no due process violation.

### 4. *HARMLESS ERROR*

Even assuming Hernandez's statement was erroneously admitted, we hold the admission harmless. *Crawford*, *Aranda*, and *Bruton* error are all subject to the harmless error standard under the rule in *Chapman v. California* (1967) 386 U.S. 18, i.e., whether the error was harmless beyond a reasonable doubt. (*People v. Jennings* (2010) 50 Cal.4th 616, 652.)

Here, both victims identified Bocanegra as pointing a gun at them. Both victims testified Hernandez also handled the gun; Bracamontes testified Hernandez pointed the gun at both the victims. Vaquera testified Bocanegra yelled, "This is South Side Pomona, Mother Fucker." Martinez had been present when Bocanegra had previously

19

admitted to membership in SSP. Hernandez had a hat on with the letter "P" which Martinez testified was SSP gang wear. Hernandez also had a tattoo reading "SSP" which Martinez likewise testified was indicia of membership in SSP. Martinez opined both defendants were members of SSP and needed to put in work to earn SSP its "trece." Both victims identified defendants as the robbers, within an hour of the robbery, out of a group of six individuals. The stolen laptops and the gun utilized in the robbery were found within the car in which defendants were stopped. Thus, overwhelming evidence, excluding Hernandez's statement, supported defendant's convictions and the true findings on the attached enhancements. Any error in admitting Hernandez's statement was, therefore, harmless beyond a reasonable doubt.

D.    <u>SUFFICIENT EVIDENCE SUPPORTS THE TRUE FINDINGS ON THE GANG ENHANCEMENTS</u>

Bocanegra contends insufficient evidence supported the jury's true findings on the gang enhancements, specifically the prong requiring the jury to find that SSP's primary activities were one or more of the statutorily enumerated crimes. We disagree.

"'In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings,

20

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility."  [Citation.]'  [Citation.]  The same test applies to the review of special circumstantial findings.  [Citation.]"  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

"Section 186.22, subdivision (b)(1), enhances the sentence for 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'  [Citation.]"  (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1170.)  Pursuant to the statue a "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated" in subdivision (e).  (§ 186.22, subd. (f).)  "Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities.  Both past and present offenses have some tendency in reason to show the group's primary activity . . . ."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)  "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony.  [Citation.]"  (*Id*. at p. 324, italics added.)

Here, Martinez testified SSP's primary activities included "[f]elony vandalisms, burglaries, robberies, assaults, assaults with deadly weapons, grand theft autos, thefts, witness intimidation, [and] extortions." Martinez also testified that SSP gang member Max Nunez had been convicted on May 24, 2011, for making criminal threats and a true finding was rendered that the offense was gang related. SSP member John Rodriguez had been convicted on May 4, 2011, of carrying a concealed firearm and possession of a controlled substance for sale. Martinez testified SSP members were attempting to earn their "trece" by putting in "work" such as robberies, assaults, thefts, and felony vandalisms. Martinez's testimony was substantial evidence supportive of the jury's finding that SSP's primary activities were statutorily enumerated crimes. (*People v. Margarejo* (2008) 162 Cal.App.4th 102, 107-108 [expert gang witnesses' testimony that gang's activities included statutorily enumerated offenses sufficient evidence to support primary activities prong]; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1464-1465 [same].)

Bocanegra cites *In re Alexander L.* (2007) 149 Cal.App.4th 605, for the proposition the evidence here was insufficient to support the primary activities prong of the gang enhancement. However, in *Alexander L.*, the expert merely testified "'I know [the gang] committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id*. at p. 611.) The court noted the officer never specified the crimes were the gang's "primary activities." Moreover, the court held the officer's testimony lacked adequate foundation because it

22

was never established how the officer knew those crimes were committed by the gang. (*Id*. at p. 612.)

Here, unlike *In re Alexander L.*, Martinez, the People's expert gang witness, specifically testified SSP's "primary activities" were "[f]elony vandalisms, burglaries, robberies, assaults, assaults with deadly weapons, grand theft autos, thefts, witness intimidation, [and] extortions." Moreover, more than adequate foundation was laid for Martinez's opinion. Martinez was "very familiar" with SSP. He had been born and raised in SSP territory. When younger, he went to school and worked with SSP members. He had at one point befriended a SSP member.

As a police officer he had been assigned to the Gang Violence Suppression Unit in Pomona for four years. As an officer he had had contact with well over 1500 gang members. Martinez had investigated "numerous crimes," including firearm offenses, committed by SSP members. He was personally familiar with Victor Hernandez, one of the founding members of SSP. He had had one prior contact with Bocanegra where Bocanegra admitted being a SSP member, had reviewed field interrogation cards on Bocanegra completed by other officers, and spoken with other officers regarding Bocanegra. Martinez had had numerous contacts with SSP member Max Nunez and had arrested him on one occasion. He had had contact with SSP member John Rodriguez on several occasions and had assisted in his arrest on one occasion. Thus, adequate foundation was laid for Martinez's opinion SSP's primary activities were statutorily enumerated crimes such that substantial evidence supported the jury's true findings on the gang enhancements.

23

E.    IMPOSITION OF UPPER TERM ON COUNT 1

Hernandez argues the sentencing court abused its discretion in imposing the upper term on the count 1 offense.  We disagree.

"Within the limits set forth by the Legislature, a trial court has broad discretion . . . whether to select the upper, middle, or lower term of imprisonment (§ 1170, subd. (b); Cal. Rules of Court, rule 4.420(b))[.]"  (*People v. Clancey* (2013) 56 Cal.4th 562, 498.) "In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing. The court shall select the term which, in the court's discretion, best serves the interests of justice.  The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law."  (§ 1170, subd. (b).)  The sentencing court's decision is subject to review for abuse of discretion.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

"[A] trial court will abuse its discretion . . . if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision. [Citation.]"  (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 847.)  Defendants bear a heavy burden when attempting to show an abuse of discretion.  (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282.)  "'In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary

24

determination to impose a particular sentence will not be set aside on review.'

[Citation.]"  (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.)

Here, the court indicated its tentative determination regarding defendants' sentencing.  It acknowledged defendants' youth and the fact that no one was harmed in the commission of the offense in its determination to strike the 10-year consecutive term for the gang enhancements.  It then permitted argument on the matter.  Hernandez's defense counsel acknowledged, "the Court has really been quite generous in terms of making" its tentative sentencing recommendation.  He likewise admitted Hernandez "has not shown remorse, that is very true."  Nonetheless, counsel requested imposition of the low term on count 1 based on Hernandez's lack of a prior record, the affect such a long sentence would have on him, and his youth.  Hernandez's counsel disagreed with the probation officer's notation Hernandez would be a danger to others if not imprisoned.

The court chose to impose "the five years as a base term.  I believe I have authority to do that.  And so that's what I'm doing.  Should be noted that I, basically, reduced the potential of their exposure by 11 years and 8 months. . . .  [¶] . . . I've considered many factors related to the defendants in this case and balanced that with what justice demands in this case.  And I believe that the sentence is an appropriate sentence . . . ."  The court's consideration of the factors relevant to the respective defendants and its determination to balance the needs of justice with defendants' youth and the fact that no one was hurt in the instant crimes were in proper exercise of its sentencing discretion.  (*People v. Sandoval*, *supra*, 41 Cal.4th at pp. 846-847 ["The trial court [is] required to specify reasons for its sentencing decision, but [is not] required to

25

cite 'facts' that support its decision or to weigh aggravating and mitigating circumstances"].)  Here, defendants did not simply use a gun in their commission of the robbery, but pointed it directly at the victims and others at the party.  Moreover, Bracamontes was verbally threatened with being shot.  The court's imposition of the aggravated term on the count 1 offense was within its discretion.

F.      CRUEL AND/OR UNUSUAL PUNISHMENT

Hernandez contends the court's sentence of 19 years, 4 months violated the state and federal constitutional prohibitions against cruel and/or unusual punishment.  We disagree.

First, we note defendant forfeited the contention by failing to raise it below.  (*People v. Em* (2009) 171 Cal.App.4th 964, 971, fn. 5; *People v. Norman* (2003) 109 Cal.App.4th 221, 229.)  Second, we find the merits of defendant's argument wanting.  The Eighth Amendment "prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime."  (*Rummel v. Estelle* (1980) 445 U.S. 263, 271 (*Rummel*).)  But "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare."  (*Id.* at p. 272; *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 (conc. opn. of Kennedy, J.).)

"A punishment may violate the California Constitution . . . if 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'  [Citation.]"  (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136 (*Cartwright*), quoting *In re Lynch* (1972) 8 Cal.3d 410, 424.)  The court, in applying this standard, examines the offense and the offender,

26

and it compares the punishment with the penalties for other California offenses and crimes in other jurisdictions. (*Cartwright*, at p. 1136; *Lynch*, at pp. 425-427.)

California sentencing statutes, however, "have long withstood constitutional challenge." (*Cartwright*, *supra*, 39 Cal.App.4th at p. 1137.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

Here, defendants' sentences are not disproportionate when compared to other crimes that do not result in death but result in substantial sentences. (See *People v. Felix* (2003) 108 Cal.App.4th 994, 1000-1001 [10-year enhancement not cruel and unusual punishment even if juvenile offender had no documented criminal history]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1230-1231 [Affirming 40-years-to-life sentence for 17-year-old gang member with no prior convictions for attempted murder with firearm enhancement]; *People v. Cisneros* (Colo. 1993) 855 P.2d 822, 830 [life without the possibility of parole for 40 years not cruel and unusual punishment for possession and sale of drugs with priors of sales of narcotics, menacing with a knife, and violation of bail conditions].)

Even if California statutes impose the longest sentences in the nation, it does not mean defendants' punishment is cruel and unusual. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.) California is not required to conform its Penal Code to either the majority rule or "'the least common denominator of penalties nationwide.' [Citation.]" (*Ibid*.) We conclude defendants' sentences are not so disproportionate "'as

27

to shock the conscience and offend fundamental notions of human dignity.' [Citation.]" (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1338 [Fourth Dist., Div. Two].)

Defendants fare no better under the federal standard. The hurdles defendants must surmount to demonstrate cruel and unusual punishment under the federal Constitution are, if anything, higher than under the state Constitution. (See generally *People v. Cooper* (1996) 43 Cal.App.4th 815, 819-824, and cases cited.) Strict proportionality between crime and punishment is not required. "'Rather, [the Eighth Amendment] forbids only extreme sentences that are "grossly disproportionate" to the crime.' [Citation.]" (*Cartwright*, *supra*, 39 Cal.App.4th at p. 1135; see also *Harmelin v. Michigan*, *supra*, 501 U.S. at p. 1001.)

In *Rummel*, *supra*, 445 U.S. 263, the United States Supreme Court rejected an Eighth Amendment challenge to a life sentence based on the defendant's conviction for credit card fraud of $80, passing a $28.36 forged check, and obtaining $120.75 by false pretenses. (*Rummel*, at pp. 265-266, 268-286.) Additionally, in *Harmelin v. Michigan*, *supra*, 501 U.S. 957, the high court ruled that a mandatory sentence of life without the possibility of parole for possession of 672 grams of cocaine did not violate the Eighth Amendment. (*Id*. at pp. 961, 995.) By contrast, what defendants did was far worse than all the crimes committed by *Rummel* and *Harmelin* combined. Defendants pointed a gun at the victims; threatened to shoot unless they obtained the victims' laptops; stole the victims' laptops, one of which was worth $17,000; and did so, at least in part, for the purpose of gaining notoriety for their gang.

In addition, the United States Supreme Court has upheld statutory schemes that result in life imprisonment for recidivists upon a third conviction for a nonviolent felony, in the face of challenges that such sentences violate the federal constitutional prohibition against cruel and unusual punishment. (See *Ewing v. California* (2003) 538 U.S. 11, 18, 30-31 [25-year-to-life sentence under "Three Strikes" law for theft of three golf clubs worth $399 apiece]; *Lockyer v. Andrade* (2003) 538 U.S. 63, 82-83 [two consecutive 25-year-to-life terms for two separate thefts of less than $100 worth of videotapes].)

The protection afforded by the Eighth Amendment is narrow. It applies only in the "'exceedingly rare'" and "'extreme'" case. (*Ewing v. California*, *supra*, 538 U.S. at p. 21.) We are not convinced this is such a case. Hernandez exposits *Miller v. Alabama* (2012) 132 S.Ct. 2455, for the proposition the sentences of 19 years, 4 months in this case are cruel and unusual. However, that decision determined only that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." (*Id*. at p. 2464, fn. omitted.) Here, defendants were not sentenced to life without parole. Nor was the sentence imposed a virtual life sentence as defendants were 17 and 18 years of age at the time of sentencing. Both defendants were awarded 144 days of credit for time served. Even if neither defendant earned any conduct credit while imprisoned, they would both be released well before their fortieth birthdays. Defendants' sentences were neither violative of the state nor federal constitutional prohibitions against cruel and/or unusual punishment.

**DISPOSITION**

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

J.

We concur:

RAMIREZ _____

P. J.

HOLLENHORST _____

J.